1    **WO**

2

3

4

5

6    **IN THE UNITED STATES DISTRICT COURT**

7    **FOR THE DISTRICT OF ARIZONA**

8

9    United States of America,

10              Plaintiff,

11   v.

12   Michael Rocky Lane,

13              Defendant.

No. CV-19-05028-PHX-DGC (DMF)
No. CR-12-01419-PHX-DGC

**ORDER**

14

15          Defendant Michael Rocky Lane has filed a motion to vacate his sentence under 28

16   U.S.C. § 2255, a motion for discovery and an evidentiary hearing, and a motion for release

17   pending appeal.   CV Docs. 10, 21, 24.[1]  Magistrate Judge Deborah M. Fine recommends

18   that the motions and a certificate of appealability be denied.   CV Doc. 48 ("R&R").

19   Defendant objects.  CV Doc. 49.  The Court will accept Judge Fine's R&R.

20   **I.    Background.**

21          **A.    Procedural History.**

22          In March 2013, a grand jury indicted Defendant on two counts of conspiracy to

23   manufacture and distribute controlled substance analogues and one count of possession

24   with intent to distribute controlled substance analogues, in violation of the Comprehensive

25   Drug Abuse Prevention and Control Act of 1970 ("CSA") and the Controlled Substance

26

27   ──────────────

28          [1] Documents filed in this civil action, No. CV-19-05028, are cited as "CV Docs."
     Documents filed in Defendant's underlying criminal case, No. CR-12-01419, are denoted
     "CR Docs."

Analogue Enforcement Act ("Analogue Act").  *See* CR Doc. 144.  The CSA prohibits the manufacture, distribution, and possession of controlled substances, which are drugs listed in Schedules I through V of the Act.  *See* 21 U.S.C. §§ 802(6), 841.  The Analogue Act prohibits the manufacture, distribution, and possession of controlled substance analogues. 21 U.S.C. § 813.  These are substances with a substantially similar chemical structure to a Schedule I or Schedule II controlled substance and that have, or are represented or intended to have, a substantially similar effect on the central nervous system.  *Id.*, *see* 21 U.S.C. § 802(32)(A).  If a controlled substance analogue is intended for human consumption, it is treated for criminal purposes as a Schedule I controlled substance under the CSA.  *Id.*; *see* 21 U.S.C. § 813.

Count 1 charged Defendant with conspiracy to manufacture or distribute controlled substance analogues MDPV, a-PVP, a-PBP, pentedrone, and pentylone; Count 3 with conspiracy to manufacture or distribute controlled substance analogues MPPP, a-PVP, a-PBP, pentedrone, and pentylone; and Count 5 with possession with intent to distribute controlled substance analogues a-PVP, pentedrone, and MPPP.[2]  CR Doc. 676 at 3-5.

To prove its case, the government had to prove that each charged substance had a chemical structure substantially similar to that of a controlled substance in Schedule I or II of the CSA ("Prong 1").  *See* CV Doc. 52 at 2.  It also had to prove that each substance had, or Defendant represented or intended it to have, a substantially similar effect on the central nervous system as a Schedule I or II controlled substance ("Prong 2").  *Id.*; *United States v. Lane*, No. CR-12-01419-DGC, 2013 WL 3199841, at *2 (D. Ariz. June 24, 2013). The government was also required to prove that Defendant knew the substances were analogues.  CV Doc. 52 at 2.

Following a three-week trial, a jury found Defendant guilty on all counts.  CR Doc. 676 at 3-5.  The Court varied downward from the sentencing guideline range of 240

---

[2] In October 2011, DEA listed MDPV as a Schedule I controlled substance.  Because the charged conspiracy in Defendant's case ran from before that date to mid-2012, the government charged MDPV both as an analogue (Count 1) and a controlled substance comparator (Counts 3 and 5).  For Counts 3 and 5, a-PVP, a-PBP, and MPPP were alleged to be analogues to MDPV.  *See* CV Doc. 52 at 2-3.

2

months and sentenced Defendant to 180 months in prison on each count, to be served concurrently, followed by 60 months of supervised release.  CR Docs. 566, 585 at 43.  The Ninth Circuit affirmed the conviction and sentences.  *United States v. Lane*, 616 Fed. App'x. 328 (9th Cir. 2015).  The Court denied Defendant's first habeas motion under 28 U.S.C. § 2255.  CR Doc. 32.

    **B.    New Material.**

    In 2018, Defendant's former attorney told him that documents produced by the United States in an analogue drug case pending in the Northern District of Texas, *United States v. Gas Pipe, Inc*., were potentially exculpatory in his case.  CV Doc. 21 at 9.  The *Gas Pipe* documents include emails between two subdivisions of the Drug Enforcement Administration ("DEA"): the Office of Diversion Control, Drug and Chemical Evaluation Section ("DCE"), which determines whether a substance qualifies as a drug analogue, and the Operational Support Division, Office of Forensic Sciences ("FS"), which specializes in identifying unknown substances.  *Id.* at 9-11; CV Doc. 48 at 9.  The *Gas Pipe* material contains three items of interest here.

    First, in April 2011, DEA circulated a draft monograph concluding in the Prong 1 analysis that MDPV is structurally similar to MDEA, a scheduled substance under the CSA.  CV Doc. 21-1 at 124-29.  FS disagreed, opining in emails that MDPV and MDEA were different in structure.  *Id.* at 136-37.  FS recommended that the monograph not be published until DEA's Analogue Committee – which makes final decisions on analogue identifications – reached a consensus on the issue.  *Id.* at 140.  After additional back and forth, DCE decided not to publish the monograph.  *Id.* at 142.  DEA never published the MDPV-MDEA monograph.  *See* CV Doc. 48 at 29.

    In October 2011, DEA listed MDPV as a Schedule I controlled substance, meaning that for uses arising after that date it was covered by the CSA and need not be considered an analogue under the Analogue Act.  CV Doc. 48 at 13.  In January 2012, DEA issued a monograph concluding that MDPV was substantially similar to methcathinone, another Schedule I controlled substance and the comparator substance charged in Count 1.  CV

Doc. 21-1 at 154-62.  This determination would be relevant to cases, like Defendant's, which involved the use of MDPV before it became a controlled substance.

Second, the *Gas Pipe* material suggests that DCE and FS may have used different methodologies for evaluating structural similarity.  At Defendant's trial, the government's expert, Dr. Thomas DiBerardino, used two-dimensional ("2D") drawings to opine that the charged analogues were structurally substantially similar to scheduled drugs.  Defendant's experts asserted that three-dimensional ("3D") models were required to make a substantial similarity determination.  FS chemists stated in the April 2011 emails that MDPV and MDEA were not substantially similar in part because of their 3D structures.  CV Doc. 21-1 at 136-37.

Third, the *Gas Pipe* material indicated that DCE proceeded with some analogue identifications without FS's concurrence, and in some cases despite FS's opposition, as early as November 2011.  *Id.* at 151; *see also* CV Doc. 49 at 8.  Defendant asserts that this is contrary to Dr. DiBerardino's suggestion at trial that DEA identifies a substance as an analogue only when there is agreement among all DEA chemists.

**C.     Amended § 2255 Motion.**

The Ninth Circuit authorized Defendant to file a second or successive § 2255 motion based on discovery of the *Gas Pipe* material, and transferred the motion to this Court.  CV Doc. 4; 28 U.S.C. § 2255(h).  The Court appointed counsel for Defendant (CV Doc. 14), and she filed an amended motion in January 2020, asserting four grounds for relief: (1) a *Brady* violation for non-disclosure of the *Gas Pipe* material; (2) failure by the government to disclose exculpatory evidence that could be used for impeachment under *Giglio v. United States*; (3) failure of the government to correct false testimony under *Napue v. Illinois*; and (4) failure to disclose the prior statements of an expert witness as required by the Jencks Act.  CV Doc. 21.  The government filed an answer, to which Defendant replied.  CV Docs. 34, 39.

Judge Fine issued a thorough, 70-page R&R on December 3, 2020, which found that Defendant's claims were procedurally defaulted and also failed on the merits.  CV

1    Doc. 48 at 18-61.  The R&R recommended that the Court deny a certificate of appealability,

2    Defendant's "Motion for Release Pending Appeal" (CV Docs. 10, 15, 17), and his motion

3    for discovery and an evidentiary hearing (CV Docs. 24, 33, 41).

4        Defendant makes three objections to the R&R.  First, he objects to Judge Fine's

5    decision that he has not shown prejudice for purposes of the cause-and-prejudice exception

6    to procedural default, and her similar conclusion, on the merits, that he has not shown

7    prejudice for purposes of a *Brady* violation.  Second, he objects to Judge Fine's failure to

8    find *Giglio*, *Napue*, and Jencks Act violations.  Third, he objects to Judge Fine's denial of

9    his request for discovery and an evidentiary hearing.  CV Doc. 49.

10       The Court "may accept, reject, or modify, in whole or in part, the findings or

11   recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  The Court must

12   review the R&R "de novo if objection is made, but not otherwise."  *United States v. Reyna-*

13   *Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).  The Court is not required to conduct

14   "any review at all . . . of any issue that is not the subject of an objection."  *Thomas v. Arn*,

15   474 U.S. 140, 149 (1985); *see* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

16   **II.    Relevant Legal Standards.**

17       **A.    Procedural Default.**

18       "Where a defendant has procedurally defaulted a claim by failing to raise it on direct

19   review, the claim may be raised in habeas only if the defendant can first demonstrate either

20   cause and actual prejudice, or that he is actually innocent."  *Bousley v. United States*, 523

21   U.S. 614, 622 (1998) (internal quotation marks and citations omitted).  Defendant concedes

22   that he did not raise arguments based on the *Gas Pipe* material either on direct appeal or in

23   his initial § 2255 motion, but Judge Fine correctly found adequate cause for this procedural

24   default because the government failed to disclose the material.  *See* CV Doc. 48 at 8;

25   *Murray v. Carrier*, 477 U.S. 478, 487 (1986) (external factors constituting cause for

26   procedural default include "a showing that the factual or legal basis for a claim was not

27   reasonably available to counsel.").  Neither party objects to this finding.[3]

28   _____

         [3] At trial, the government disclosed that DEA at some point had considered MDPV

5

1    Judge Fine found, however, that Defendant failed to establish prejudice. CV Doc. 48

2    at 24-29.  Because cause *and* prejudice are required to excuse a procedural default, she

3    recommended denial of the § 2255 motion.  Defendant objects.  *See* CV Doc. 49.[4]

4    "[T]he prejudice prong of the [procedural default] test requires demonstrating 'not

5    merely that the errors at . . . trial created a *possibility* of prejudice, but that they worked to

6    his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional

7    dimensions.'"  *United States v. Braswell*, 501 F.3d 1147, 1150 (9th Cir. 2007) (quoting

8    *United States v. Frady*, 456 U.S. 152, 170 (1982)) (emphasis in *Frady*).  Defendant must

9    show "'a reasonable probability' that the result of the trial would have been different if the

10   suppressed documents had been disclosed to the defense."  *Strickler v. Greene*, 527 U.S.

11   263, 289 (1999) (citation omitted).

12   **B.    Review of Second or Successive Habeas Motions Under § 2244(b).**

13   Even if Defendant shows cause and prejudice sufficient to overcome his procedural

14   default, he must also clear the high bar Congress has erected for a second or successive

15   § 2255 motion.  Defendant must show that the "newly discovered evidence . . . , if proven

16   and viewed in light of the evidence as a whole, would be sufficient to establish by clear

17   and convincing evidence that no reasonable factfinder would have found the movant guilty

18   of the offense."  28 U.S.C. § 2244(b)(2)(B)(ii); *see also* 28 U.S.C. § 2244(b)(4); *United*

19   *States v. Villa-Gonzalez*, 208 F.3d 1160, 1164 (9th Cir. 2000).  This is a demanding

20   standard.  The new evidence must, in effect, "clearly and convincingly prove the prisoner's

21   innocence[.]"  *United States v. Buenrostro*, 638 F.3d 720, 724 (9th Cir. 2011).  The

22   Supreme Court has upheld the constitutionality of this stringent § 2244(b) requirement.

23   *See Felker v. Turpin*, 518 U.S. 651, 664 (1996).[5]

24   as an analogue of both MDEA and methcathinone, but had decided to recognize only
     methcathinone as the comparator to MDPV after DEA received "additional information."
25   CV Doc. 48 at 23-24.  Judge Fine correctly found that this mention of "additional
     information" failed to alert Defendant to the dissenting opinions within DEA about the
26   MDPV-MDEA comparison.  *Id.* at 24.

27   [4] Judge Fine also found that Defendant failed to establish his actual innocence.  CV
     Doc. 48 at 29-30.  No party objects to this finding.
28

     [5] Section 2244(b)(2)(B) has a second requirement.  Defendant also must show that

This high threshold applies to second and successive habeas motions asserting *Brady* claims. *Brown v. Muniz*, 889 F.3d 661, 674 (9th Cir. 2018) ("[W]e hold that Brown's *Brady* claim was ripe at the time of his first habeas petition because the alleged constitutional violation – failure to turn over the Hockett, Hutchings, and Gin information – occurred before Brown's trial even began.  Thus, § 2244(b) applies to Brown's claim and he is entitled to file a second or successive habeas petition only if he satisfies that provision's gatekeeping requirements.").   Section 2244(b) effectively "elevates the 'reasonable probability' standard for *Brady* materiality to a more demanding 'clear and convincing' standard." *Id.* at 675.  If Defendant does not satisfy the § 2244(b) standard, the Court "must dismiss the motion that [the court of appeal has] allowed the applicant to file, without reaching the merits of the motion[.]" *Villa-Gonzalez*, 208 F.3d at 1164-65 (quoting *Bennett v. United States*, 119 F.3d 468, 470 (7th Cir. 1997)); *see also* 28 U.S.C. § 2244(b)(4).[6]

The fact that the Ninth Circuit previously authorized Defendant to file his second or successive motion does not excuse this Court from determining whether he satisfies the § 2244(b) requirements.  The Ninth Circuit considered only whether Defendant had made a *prima facie* showing "of *possible* merit to warrant a fuller exploration by the district court." *Henry v. Spearman*, 899 F.3d 703, 706 (9th Cir. 2018) (quoting *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004)) (emphasis in *Cooper*); 28 U.S.C. § 2244(b)(3)(C).  This determination does not preclude a district court from determining whether the statutory threshold has been met.  *See Villa-Gonzalez*, 208 F.3d at 1164 ("Villa-Gonzalez contends that our grant of permission forecloses the district court from finding his motion does not meet the statutory requirements.  Villa-Gonzalez's contention

---

[6] "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence."  28 U.S.C. § 2244(b)(2)(B)(i).  Defendant meets this standard because the *Gas Pipe* material was not previously disclosed by the government.

[6] The *Brown* case cited above was a state-conviction habeas petition under 28 U.S.C. § 2254.  889 F.3d at 666.  The Ninth Circuit has made clear, however, that the habeas threshold found in § 2244(b) apples as well to federal-conviction petitions under § 2255, like this one.  *See Villa-Gonzalez*, 208 F.3d at 1164 ("Section 2255, by its terms, expressly incorporates the procedures for certification of the filing of a second or successive motion set forth in section 2244.").

lacks merit.").  On the contrary, the "district court *must conduct* a thorough review of all allegations and evidence presented by the prisoner to determine whether the motion meets the statutory requirements for the filing of a second or successive motion." *Id.* at 1164-65 (emphasis added).  The statute itself makes this clear: "A district court *shall dismiss* any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." 28 U.S.C. § 2244(b)(4) (emphasis added).  Thus, the Court must determine whether the *Gas Pipe* material, "if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [Defendant] guilty of the offense."   28 U.S.C. § 2244(b)(2)(B)(ii).

### C.    The Court's Approach in this Case.

The parties and Judge Fine devote significant time to evaluating the prejudice prong of the procedural default analysis and the similar prejudice requirement under *Brady*.  The Court will not address these subjects because Defendant's second or successive motion fails to clear the high statutory threshold in § 2244(b)(2)(B)(ii).  As a result, his motion must be dismissed regardless of whether he can excuse his procedural default or show *Brady* prejudice.

## III.   Analysis.

### A.    Proof Requirements of the Analogue Act.

To accurately evaluate Defendant's arguments, one must understand the purpose, structure, and proof requirements of the Analogue Act.  The statute was enacted to address the rapidly evolving field of "designer drugs" – to enable the government to stem the flow of dangerous chemicals designed to mimic the effects of Schedule I and II controlled substances but which, because of their slightly modified chemical structures, are not actually controlled by the CSA.  As the Eighth Circuit explained:  "Because manufacturers of illegal drugs have become adept at tinkering with the molecular structure of controlled substances while retaining the effects those substances produce, the analogue statute is

aimed at prohibiting innovative drugs before they are specifically listed in the schedules as controlled substances." *United States v. McKinney*, 79 F.3d 105, 107-08 (8th Cir. 1996).

The evidence in this case provides an apt illustration.  Defendant was well aware of the Analogue Act and modified his lucrative designer drug manufacturing operation to stay a step ahead of law enforcement, despite knowing that the drugs he was making and shipping around the world were very dangerous.  *See*, *e.g.*, CV Docs. 34-7 at 1-3; 34-8 at 2; 34-9 at 2; 34-11 at 2-3.  When one analogue became a controlled substance, he switched to another.  *See*, *e.g.,* CV Doc. 34-6 at 43-44.  These facts are set forth at some length, with record citations, in the government's response to Defendant's § 2255 motion.  *See* CV Doc. 34 at 17-23.

In passing the Analogue Act to regulate these rapidly-evolving substances, Congress required that they be substantially similar in chemical structure and effect to already-scheduled controlled substances, but Congress did not adopt a precise scientific definition.  To the contrary, courts recognize that "the actual determination of substantial similarity is not a scientific one."  *United States v. Requena*, 980 F.3d 30, 47 (2d Cir. 2020).  "[S]ubstantial similarity is not *itself* a scientific standard," *id.* (emphasis in original), and "there is no indication that Congress intended the words 'substantially similar' to have a specialized scientific meaning," *United States v. Bays*, No. 3:13–CR–0357–B, 2014 WL 3764876, at *3 (N.D. Tex., July 31, 2014) (citation omitted).  Consequently, "these words should be given their ordinary meaning."  *Id.* (citation omitted).  As Dr. DiBerardino testified at Defendant's trial, substantial similarity "is an opinion.  It's not a scientific fact." Doc. 667 at 159.

This Court covered similar ground in Defendant's criminal case:

> Defendants . . . argue that the Analogue Act is unconstitutionally vague because it does not define the terms "chemical structure," "substantially similar," or "human consumption," leaving ordinary people to guess at whether the Act applies in a particular case.  Defendants note that there is no dictionary definition of "substantially similar," and the experts in this case could not cite any scientific definitions of "chemical structure."  Courts have found, however, that the relevant inquiry for purposes of the Analogue Act is how an ordinary person would interpret these terms, not how they might be technically defined. The Eighth Circuit found in *McKinney* that a

reasonable layperson could decide by comparing the chemical diagrams of two substances whether their structures were substantially similar for purposes of the Analogue Act. The Fourth Circuit followed *McKinney's* reasoning in [*United States v. Klecker*], 348 F.3d at 72, which found that, notwithstanding other important differences pointed out by the experts, the structural similarities between two substances represented by chemical diagrams were sufficient "to put a reasonable person on notice that Foxy might be regarded as a DET analogue." As the Fifth Circuit concluded in [*United States v. Granberry*], 916 F.2d at 1010, the definition of a controlled substance analogue is stated "in terms readily comprehensible to the ordinary reader" and therefore "provides adequate notice of what conduct is prohibited."

*Lane*, 2013 WL 3199841 at *7.

As a result of this approach in the Analogue Act, "there is no one avenue that an expert must take to determine whether two chemical compounds are substantially similar." *Bays*, 2014 WL 3764876 at *7. Courts have refused to endorse a single method of analyzing chemical structure, rejecting arguments that expert chemists should be excluded under *Daubert* because they prefer 2D over 3D analysis, and repeatedly finding 2D analysis to be a reliable method of determining substantial similarity. *See, e.g., Requena*, 980 F.3d at 47 (district court had "ample basis to conclude" that expert's substantial similarity opinion was the product of reliable methods where, among other things, expert described chemical structure using two-dimensional diagrams); *Bays*, 2014 WL 3764876 at *8 ("[T]he Court agrees with the Government that two-dimensional modeling is a reliable method of comparing the chemical structure of two compounds"); *United States v. Brown*, 279 F. Supp. 2d 1238, 1244 (S.D. Ala. 2003) (experts employed an accepted method of assessing substantial similarity by viewing molecules in their two-dimensional static state).

Because substantial similarity is not a technical term, but a matter to be decided by the jury on the basis of the ordinary meaning of those words, the fact that chemists within DEA may disagree on substantial similarity has not been viewed by courts as particularly relevant. The Ninth Circuit, for example, held in an unpublished opinion that "the Analogue Act cases require *the jury* to decide whether a substance is a controlled substance analogue based on the expert testimony presented at trial. DEA's internal decisions to treat the substance at issue as analogues would thus not help [the defendant] prepare a defense."

*United States v. Way*, 804 Fed. App'x. 504, 509 (9th Cir. 2020) (emphasis added).  The Ninth Circuit held:

> The district court did not err in not allowing testimony about DEA's internal processes for controlled substance analogue determinations. . . . The district court ruled that since the jury would decide what was a controlled substance analogue, any internal DEA disagreement as to whether 5-F-UR-144 was an analogue was irrelevant.  We agree with the district court.

*Id.*

Defendant's arguments must be evaluated against this background.  The statutory scheme does not demand scientific precision.  The jury in Defendant's case was required to make the substantial similarity finding after hearing competing opinions from chemistry experts on both sides.  The fact that other experts may disagree on the same issue – even within DEA – is not as probative as Defendant suggests.

## B.    Objection to Judge Fine's Prejudice Decisions.

Judge Fine found that the government's failure to produce the *Gas Pipe* material was not prejudicial to Defendant's case.  Defendant objects, and the Court accordingly will undertake de novo review.

### 1.    Testimony of Dr. DiBerardino.

Defendant asserts that the R&R takes an unduly restrictive view of the *Gas Pipe* material by concluding it is irrelevant to his case.  Even though the material does not concern the analogues charged in his case, Defendant argues, it reveals a "very broad and ongoing dispute" within DEA about "how to determine whether any alleged substance was substantially similar to a scheduled substance, what methods were used, and at what point there was enough 'substantial similarity' between the two substances to make such a call."  CV Doc. 49 at 8, 11.  Defendant contends that access to the *Gas Pipe* evidence would have enabled him to impeach Dr. DiBerardino's testimony that DEA reached its analogue determinations through consensus; call FS chemists to testify about Dr. DiBerardino's flawed methodology; and reinforce the testimony of the defense expert who opined that 3D methods were more appropriate and that DEA's substantial similarity determinations were

1
2
3

arbitrary. *Id.* at 2-13.  This is particularly significant, Defendant asserts, because the jury needed to determine structural substantial similarity to reach a guilty verdict, and the prosecution's sole evidence on this issue was Dr. DiBerardino's testimony. *Id.* at 14-15.[7]

4
5
6
7
8

The Court has reviewed the trial testimony of Dr. DiBerardino and does not find it as vulnerable as Defendant suggests.  Defendant argues that the *Gas Pipe* material shows DEA did not always operate by consensus, that there were disagreements between DCE and FS, and that DEA sometimes identified a drug analogue despite internal disagreement. But Dr. DiBerardino did not present a significantly different picture at trial.

9
10
11
12
13

Dr. DiBerardino is part of DCE, the entity within DEA charged with making analogue identifications.  CR Doc. 667 at 50.[8]  He did testify that DEA acts "when everybody is onboard" and in "agreement." *Id.* at 58-59, 119.  But taken in context, the Court cannot conclude that these statements led the jury to believe there is never disagreement among DEA chemists on the question of structural substantial similarity.

14
15
16
17
18
19
20
21
22

Dr. DiBerardino testified that initial analogue determinations within DCE often prompt "discussions and comparisons and debates, not only within our immediate section, but then we go to [FS] chemists . . . and have them also weigh in."  CR Doc. 667 at 54; *see also id.* at 55 (DCE seeks "feedback" from FS chemists).  He acknowledged that FS chemists may disagree with a DCE opinion that a potential analogue is structurally substantially similar to a Schedule I or II substance, opining instead that the substance "should be compared to something else" or that "there's a problem with [the proposed] comparison." *Id.* at 55.  He testified that "whatever the case may be, we take their feedback and ultimately determine whether or not something is substantially similar." *Id.*

23

_____

24
25
26
27

[7] Defendant's argument on this point includes Dr. DiBerardino's testimony before the Court in a *Daubert* hearing that "when we do these reviews, there is a very, very, very high degree of certainty." CV Doc. 34 at 15.  But Defendant does not challenge the Court's *Daubert* ruling, and the jury did not hear the *Daubert* testimony.  The testimony therefore is not relevant to the § 2244((b) threshold, which focuses on what effect the *Gas Pipe* material would have had *at trial*.

28

[8] Defendant cites Dr. DiBerardino's testimony in a partial transcript filed during the trial. *See* CR Doc. 439.  The Court will cite to the official transcript filed after trial. *See* CR Doc 667.

Dr. DiBerardino was specifically asked whether there is ever disagreement within DEA about an analogue determination:

> Q: So you talked about doing your write-up and then getting a review. Are there times during the review process that somebody disagrees?
>
> A: Oh, yeah.
>
> Q: And what happens?
>
> A: Well, then we discuss it. And, I mean, sometimes a disagreement may be based on – well, it's an opinion. So the disagreement may be that the person is – had – could be swayed, let's say, or the person cannot be. But usually what happens, if there's one person who disagrees, we're all kind of in a – on the fence. It's not like everybody is sure this is absolutely substantially similar and then one person thinks it's not. That's not how it usually works. So I think I'm exaggerating this scenario right now. But what happened is that we may be on the fence and then somebody will push us over and say, no, and then we will agree. Maybe not. And we will step back from that.

CR Doc. 667 at 59-60.

Significantly, Dr. DiBerardino testified that there is no fixed scientific method for determining substantial similarity in chemical structure. *Id.* at 60 (there is no "bright-line test"; "it's not bean counting"). He explained that "substantially similar" is not a phrase from chemistry or other sciences, but instead comes from the Analogue Act. As a result, any conclusion that a substance is structurally substantially similar "is an opinion," "not a scientific fact." *Id.* at 115-16, 158-59. Indeed, Dr. DiBerardino confirmed that "[t]here is no written protocol, rules, regulations on how DEA makes their determinations of substantial similarity." *Id.* at 173-74. DEA's identification of an analogue is "all opinion." *Id.* at 174.

Although the Defendant tried at trial to make much of this fact, suggesting to the jury that it rendered the Analogue Act arbitrary, Dr. DiBerardino explained that DEA's identification of an analogue has no legal effect. The monographs issued by DEA explaining why a substance is substantially similar in structure and effect to a controlled

substance are not legal documents.  CR Doc. 667 at 120.  They state opinions.  *Id.* at 174.  The prosecution in analogue cases has the burden of proving to the jury's satisfaction that the statutory requirements have been met – that the alleged analogue is substantially similar in structure and effect to a Schedule I or II drug.  In response to a question from the prosecutor, Dr. DiBerardino explained: "We don't determine if something is an analogue.  That's your job."  *Id.* at 120.[9]

Dr. DiBerardino explained that the final decision to opine that a substance is an analogue is made by DEA's Analogue Committee.  CR Doc. 667 at 119.  DEA publishes a monograph identifying the analogue, but its determination has no binding legal effect.  *Id.* at 120, 199 ("[T]hey're not legal documents.  They don't modify the CSA.  It's not regulatory.  It's just our evaluation.").  The burden then rests on prosecutors to prove substantial structural similarity in criminal trials.  *See*, *e.g.*, *U.S. v. Klecker*, 228 F. Supp. 2d 720, 727 (E.D. Va. 2002), *aff'd*, 348 F.3d 69 (4th Cir. 2003).

The *Gas Pipe* material is in many respects consistent with Dr. DiBerardino's testimony that there can be discussion, debate, and disagreement within DEA on whether a substance is structurally substantially similar to a listed drug, and that the final decision is made by the DCE and Analogue Committee.  The April 2011 emails cited by Defendant show DEA scientists discussing and disagreeing on the proposed MDPV-MDEA analogue comparison, and offering opinions rather than precise formulas.  *See*, *e.g.*, CV Doc. 21-1 at 17-18 (FS chemist discussing chemical structure of MDEA and MDPV and noting that

---

[9] In asserting that Dr. DiBerardino testified that DEA's decisions are always unanimous, Defendant emphasizes this excerpt: "I could almost guarantee this would not go forward as an analogue.  Because **if there is any doubt**, we don't want to push something that is going to waste a lot of people's time and – I mean, it would be wrong."  CV Doc. 49 at 5 (emphasis in Defendant's brief).  But this testimony is taken out of context.  Dr. DiBerardino was responding to a question about whether water could ever be identified as an analogue to hydrogen peroxide – a hypothetical comparison posited by defense counsel during opening statements to suggest that virtually any substance can be viewed as substantially similar to another.  CR Doc. 667 at 122-23.  Dr. DiBerardino responded that someone theoretically could argue that water and hydrogen peroxide are structurally similar, but he then said – starting Defendant's quoted statement – that he could almost guarantee this would not go forward as an analogue and "would be wrong."  *Id.*  The Court does not view this testimony as a general comment on DEA procedures, but as a response to a specific hypothetical posed by Defendant.

"in [FS's] opinion, they are not substantially structurally similar."); *id.* at 19 (FS chemist noting that "[w]hile there are some obvious similarities in the structures" of MDPV and MDEA, they are "not substantially similar in structure in my opinion."). Because of this disagreement, DEA chose not to identify MDVP as an analogue of MDEA. *Id.* at 142. The *Gas Pipe* material confirms what Dr. DiBerardino testified to: that there can be discussion and debate within DEA about an analogue identification and, as an FS chemist testified, that DCE is "the authoritative body within DEA to make these decisions." CV Doc. 23-1 at 49.[10]

The *Gas Pipe* material would have enhanced Defendant's cross-examination of Dr. DiBerardino. The fact that other DEA chemists disagreed with the MDPV-MDEA conclusion reached by Dr. DiBerardino's group, and that DEA ultimately chose not to adopt the conclusion, could undermine his credibility to some degree. But the fact remains that these are opinions, not scientific conclusions. Dr. DiBerardino readily acknowledged that there is debate within DEA about them, and he clearly stated that the DEA opinions have no legal effect. The jury is charged with making the binding analogue determinations. *See Way*, 804 Fed. App'x. at 509.

What is more, Dr. DiBerardino did not base his opinions about the analogues in Defendant's case on the fact that DEA had found them to be analogues. His testimony

---

[10] Defendant asserts that "debate was raging within the DEA as to numerous substances and constituted a fundamental disagreement within DEA about how to determine 'substantial similarity' between two substances." CV Doc. 48 at 8. Defendant specifically cites the testimony of an unnamed DEA chemist in the *Gas Pipe* case. *Id.* In addition to the disagreement within DEA on the MDPV-MDEA comparison, the chemist also identified disagreements with respect to JWH-251, UR-144, and AM-694. CV Doc. 23-1 at 21, 33-35. When asked how many substances FS disagreed on, the chemist testified that there were at least a dozen. Defendant contends that another DEA chemist, Dr. Arthur Berrier, stated in an online article that there were "dozens" of substances on which no consensus was reached. CV Doc. 49 at 12. But the cite Defendant provides (CV Doc. 21-4 at 40) does not exist in the record. Defendant also notes that Judge Fine cited the article, which she did (*see* CV Doc. 48 at 44), but the page she cites makes no mention of dozens of substances (*see* CV Doc. 21-2 at 40). Even assuming there was disagreement on many substances, Defendant provides no evidence of DEA disagreement about any of the analogues charged in this case. Disagreements on other substances would only underscore what was already abundantly clear during trial – that chemists and others can disagree on substantial similarity opinions, and it was up to the jury to make the decision on the basis of the expert testimony before them.

1  instead comprised 65 pages of detailed chemical structure explanations to show why he

2  believed each of the charged substances was structurally substantially similar to a

3  controlled substance.[11]  *See* CR Doc. 667 at 63-118.  In contract to these extended and

4  detailed chemistry discussions, Dr. DiBerardino's testimony about internal DEA

5  procedures – testimony emphasized by Defendant as suggesting that unanimity is always

6  obtained – comprised less than ten pages.  *Id.* at 53-60, 118-19.  DEA procedures were not

7  a central part of his testimony.  And as is evident from the cross-examination of Dr.

8  DiBerardino and the defense experts, the focus in this case was on whether the substances

9  were in fact structurally substantially similar, not on DEA procedures.  For all of these

10  reasons, the Court concludes that the cross-examination value added by the *Gas Pipe*

11  material would have been marginal at best.

12  **2.  Claimed Prejudice to All Substances.**

13  Defendant also objects to Judge Fine's conclusion that the *Gas Pipe* documents do

14  not concern any analogue at issue in Defendant's trial.  CV Doc. 49 at 7.  Although this is

15  a correct statement, Defendant argues that the *Gas Pipe* material shows that DCE and FS

16  frequently disagreed on whether Prong 1 of the analogue determination was satisfied, and

17  the documents therefore implicate all of the analogues at issue in Defendant's trial.  *Id.* at

18  7-8.  But the marginal relevance of any disagreement within DEA, as discussed above, is

19  even more attenuated for the analogues in this case, for which Defendant presents no

20  evidence of internal disagreement.

21

22

23  [11] For example, Dr. DiBerardino provided this explanation – while showing the jury
a diagram – to support his opinion that MDPV is an analogue to methcathinone: "Row A
24  is the phenethylamine core which we identified on the previous page.  And it's bold, so
you can see it sitting there, and obviously, they're in both cases. On Row B is the alpha
25  position. Now, this alpha position has what's called a carbonyl carbon – it's an oxygen
attached – a double-bonded oxygen attached to a carbon. It's called a carbonyl group. And
26  this particular attachment, even though it's kind of small and inconsequential, is pretty
important, actually, because it actually further subcategorizes the phenethylamine as
27  what's been commonly called synthetic cathinones. . . . Row C is the substitution on the
alpha position that we identified previously. What's significant about this is that it's a –
28  they're carbon atoms. In one case, in the methyl – in the methcathinone, there is only one
carbon group. CH3. It's called a methyl group." CR Doc. 667 at 97.

16

Defendant also argues that FS's use of a 3D approach, as revealed in the *Gas Pipe* documents, would have enabled him to undercut Dr. DiBerardino's use of a 2D approach at trial and his testimony that 3D models are unnecessary.  *Id.* at 10-11.  Although this information also would have added some marginal benefit to the cross-examination, the Court does not find it to be significant.  The contrast between 2D and 3D analyses was a prominent part of Defendant's trial.  Dr. DiBerardino testified that he relies on 2D drawings of chemical structure because they convey to a trained chemist all of the information needed to form a substantial similarity opinion.  CR Doc. 667 at 65, 79.  He also stated that he had examined each of the charged analogues in this case using 3D techniques, and that the 3D analysis confirmed his opinions.  *Id.* at 68-69, 80-81.  Indeed, he presented 3D illustrations of each of the charged substances to the jury, enabling them to consider 3D analysis in their deliberations and illustrating why his opinions, although initially formed using 2D drawings, were consistent with a 3D inquiry.  *See, e.g.*, *id.* at 68-69.

Defense counsel vigorously cross-examined Dr. DiBerardino on 2D versus 3D analyses.  *Id.* at 137-48.  The defense rebuttal expert, Dr. Patrick Woster, testified about why analogue opinions should not be based on 2D models, including that such models fail to take into account various factors relevant to making scientifically sound analogue determinations.  CR Doc. 674 at 42-45.  Defense expert Dr. Nicholas Cozzi testified that 2D models are a "shorthand method" from which a person would be "unable to reach a conclusion" about a substance.  *Id.* at 107, 170.  And in closing argument, defense counsel reiterated these points for the jury, stating that "true scientists" avoid 2D modeling because it is scientifically unsound.  CR Doc. 675 at 105, 111.

The *Gas Pipe* material would have revealed that at least some FS chemists within DEA prefer 3D analysis, which would have bolstered Defendant's 3D arguments.  But because the jury was already well aware of those arguments, and Dr. DiBerardino had used 3D analysis to confirm his opinions, the Court cannot conclude that the *Gas Pipe* material would have made a significant difference.  The issue was whether the analogues charged

in this case were structurally substantially similar, and the jury was well equipped by the evidence to make that decision, including considering 3D analysis if relevant.

The Court also notes that the FS witness quoted in the *Gas Pipe* material testified that a difference of approach within DEA is not necessarily a bad thing. He said: "I'm not sure if we ever strove to achieve consensus or duplication on how we're going to approach the matter. That's not efficient to have two groups doing the exact same thing." CV Doc. 23-1 at 48-49.[12]

**3.** **Defendant Cannot Satisfy the Standard in 28 U.S.C. § 2244(b).**

To satisfy the § 2244(b) standard, Defendant must show that the *Gas Pipe* material, "viewed in light of the evidence as a whole, would be sufficient to establish *by clear and convincing evidence* that *no reasonable factfinder* would have found [him] guilty of the offense." 28 U.S.C. §§ 2244(b)(2)(B)(ii) (emphasis added). For several reasons, Defendant cannot meet this standard.

First, as Judge Fine observed, the internal DEA dissents discussed in the *Gas Pipe* material involve analogues never charged in Defendant's case. *See, e.g.*, CV Doc. 48 at 29, 40, 50-52. Defendant's primary argument – that existing evidence of internal DEA disagreement about non-charged substances suggests there must have been disagreements about charged substances – is simply speculative. CV Doc. 21 at 24-25, 44; *Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995) ("It is well-settled that conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.") (citations omitted).

---

[12] *Gas Pipe* material from 2016 and 2017 – well after Defendant's conviction – shows that DEA listed the substance a-PPP as a "probable analogue" of MDPV and indicate that DCE may have issued an internal opinion about it. *See* CV Doc. 39-1 at 41. Defendant argues that this material is exculpatory given the government's statement, in its response to Defendant's § 2255 motion, that it considered charging Defendant with a-PPP, but changed its mind after concluding that a-PPP was "less potent" than the other charged substances Defendant was selling. CV Doc. 48 at 50-51. Defendant argues that the defense could have used this to undermine DEA's substantial similarity decisions before the jury by showing that DEA had a practice of listing substances as potential analogues, despite earlier concluding that those same substances were "too potent" to qualify as substantially similar under Prong Two. CV Doc. 49 at 15-16. But as Judge Fine stated in the R&R, this argument is irrelevant because a-PPP was never charged in Defendant's case and the referenced material was created well after his conviction. CV Doc. 48 at 50-52.

1    Second, to the extent the *Gas Pipe* documents relate to MDPV, an analogue charged

2    in Count 1, they concern only the proposed MPDV-MDEA comparison that DEA never

3    adopted.  *See* CV Doc. 21-1 at 124-29.  The government charged MDPV in Count 1 as an

4    analogue to methcathinone.  *See* CV Doc. 52 at 2.  The *Gas Pipe* documents contain no

5    internal discussion within DEA about the MDPV-methcathinone comparison.

6    Third, to find Defendant guilty on each count, the jury needed to find that only one

7    of the charged substances was an analogue.   The jury found that all of the charged

8    substances were analogues – five in Count 1, five in Count 3, and three in Count 5.   CR

9    Doc. 676 at 3-5; CV Doc. 48 at 29.

10   Fourth, Dr. DiBerardino acknowledged that the DEA review process involves

11   internal disagreement.  CR Doc. 667 at 59.  This was not unclear testimony.  When asked

12   if chemists within DEA ever disagree on analogue determinations, he said "Oh, yeah."  CR

13   Doc. 667 at 59-60.  He also acknowledged that substantial similarity determinations are

14   matters of opinion.  *Id.*

15   Fifth, the Court cannot conclude that Defendant was prejudiced, as he claims, by his

16   inability to call FS chemists to testify about their use of 3D modeling.  Those chemists

17   might well have agreed with Dr. DiBerardino's conclusions on the analogues at issue in

18   this case.[13]   And as already noted, the 2D versus 3D dispute was presented squarely by

19   defense experts during the trial.

20   Sixth and most importantly, to satisfy the § 2244(b) standard, Defendant must show

21   by clear and convincing evidence that the *Gas Pipe* material would have so altered the

22   quantum of proof at trial that "no reasonable factfinder" would have found him guilty.  28

23   U.S.C. §§ 2244(b)(2)(B)(ii).  Even if the material would have enabled a more effective

24   cross-examination of Dr. DiBerardino, the jury still could have chosen to accept his expert

25   opinion about the structural similarities of the analogues.  The *Gas Pipe* material would

26   not have prevented Dr. DiBerardino from testifying and giving his detailed explanations of

27

28   [13] Even if the numbers from Dr. Berrier are accepted (disagreeing with about 15 out of 80 DCE analogue determinations, *see* CV Doc. 21-2 at 41), FS chemists agreed with DCE far more often than they disagreed.

why the chemical structures were substantially similar.  CR Doc. 667 at 63-118.  And the Court cannot conclude that the material would have so destroyed his credibility that no reasonable juror would have believed him.  Dr. DiBerardino testified on the basis of his Ph.D. in chemistry, his 19 years as a DEA chemist specifically tasked with implementing federal law by assessing the chemical structures of various substances, and his years of teaching law enforcement agencies around the world how to do chemical analyses.  CR Doc. 667 at 49-50, 52.  Faced with more evidence of internal disagreement at DEA and support for 3D models, the jury still could have chosen to accept Dr. DiBerardino's expert opinions.  The *Gas Pipe* material and other information Defendant hopes to obtain through discovery might, if available to the defense at trial, have intensified the factual dispute before the jury.  But Defendant cannot show that it would "clearly and convincingly prove [his] innocence."  *Buenrostro*, 638 F.3d at 724.  That is what Defendant must show – that "no reasonable factfinder" would have accepted Dr. DiBerardino's opinions and found him guilty.  28 U.S.C. § 2244(b)(2)(B)(ii).

Granted, this is an extremely high bar.  It eclipses the "reasonable probability" standard of procedural default and *Brady* prejudice, and makes it much harder for Defendant to obtain habeas relief in this second or successive motion.  But the Ninth Circuit has accepted, as it must, the high bar set by Congress:

> We appreciate that our application of AEDPA's second or successive bar to *Brady* claims may seem harsh.  Why should courts saddle petitioners with a stringent standard of proof that is a function of the government's own neglect, or worse, malfeasance?  The answer is that such is the framework Congress established.  That a petitioner's burden is higher under these circumstances may seem inequitable, but that is a policy, not a legal, objection. Through § 2244(b), Congress made the legislative choice to prioritize state-federal comity and the finality of criminal proceedings over affording petitioners multiple opportunities to invoke the federal courts' jurisdiction under the same standard of review—a choice that the Supreme Court has definitively held to be consistent with the [Constitution].

*Brown*, 889 F.3d at 676.[14]

Because Defendant has not shown that the *Gas Pipe* material meets the § 2244(b) standard, the Court must dismiss his motion.  28 U.S.C. § 2244(b)(4); *Villa-Gonzalez*, 208 F.3d at 1164-65.

### C.     Objection to *Giglio* and *Napue* Findings.

Defendant objects to Judge Fine's failure to find *Giglio* and *Napue* violations, incorporating by reference his procedural default and *Brady* prejudice arguments.  *See* CV Doc. 49 at 16-17.  *Giglio* violations require the same proof as procedural default prejudice – "a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different[.]"  *Mellen v. Winn*, 900 F.3d 1085, 1089 (9th Cir. 2018).  *Napue* violations require Defendant to show that the evidence at trial was actually false, the prosecution knew or should have known it was false, and the false evidence was material.  *United States v. Zuno-Arce*, 339 F.3d 886, 889 (9th Cir. 2003).  But even if Defendant could show that the *Giglio* or *Napue* standards are met, he would again have to clear the § 2244(b) threshold, which he cannot do.

### D.     Objection to Jencks Act Findings.

Defendant argued in his amended § 2255 motion that the government's failure to disclose the *Gas Pipe* material violated the Jencks Act, which requires the Court, on motion of the defendant, to order the United States to produce any "statement" of a witness in the government's possession which relates to the subject matter about which the witness has testified.  18 U.S.C. § 3500(b).  Jencks Act claims are not subject to § 2255 habeas review. *Beavers v. United States.*, 351 F.2d 507, 509 (9th Cir. 1965) (citing *Black v. United States*, 269 F.2d 38, 41-42 (9th Cir. 1959)); *Lincoln v. Sunn*, 807 F.2d 805, 816 (9th Cir. 1987) (because the Jencks Act involves "evidentiary rules governing federal trials, [it does] not invoke constitutional considerations.").  In any event, because Defendant makes no specific

---

[14] *Brown* mentions state-federal comity because, as already noted, it was a § 2254 petition about a state-court conviction.  The second priority identified by the Ninth Circuit – finality of criminal proceedings – applies in this § 2255 petition.

objections to the R&R's recommendation on his Jencks Act claims, the Court has no obligation to address them. *Thomas*, 474 U.S. at 149.

## IV.   Motion for Discovery and Evidentiary Hearing.

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). A court may, however, allow discovery in § 2255 cases for good cause. *See* Rules Governing Section 2255 Cases 6(a). Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . . entitled to relief[.]" *Bracy*, 520 U.S. at 909 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). Similarly, to show that he is entitled to an evidentiary hearing, a movant must allege "specific factual allegations that, if true, state a claim on which relief could be granted." *United States v. Leonti*, 326 F.3d 1111, 1116 (9th Cir. 2003) (internal quotations and citations omitted).

Defendant requests discovery and an evidentiary hearing to determine whether additional *Brady* material exists as to the analogues charged in his case, to obtain testimony from FS witnesses about how analogue decisions were made at the time of his trial, and to question prosecution witnesses about alleged *Brady* violations and dissenting opinions within DEA. *See* CV Doc. 24 at 2-6. The Court might be inclined to grant this discovery if procedural default prejudice and the *Brady* and *Giglio* tests were the only bars to be cleared, but the § 2244(b) threshold would still loom. Such discovery, even if successful, would only bolster Defendant's cross-examination of Dr. DiBerardino. While stronger cross might make for a closer trial, it would not render the jury unable to convict Defendant. The jury would still have Dr. DiBerardino's detailed chemistry explanations for why the analogues in this case are structurally substantially similar to controlled substances, and could choose to believe that testimony in fulfilling its function of deciding substantial similarity. The Court could not find, by clear and convincing evidence, that a reasonable factfinder would be unable to credit Dr. DiBerardino's testimony and convict Defendant. The case still would be dismissed. *See* 28 U.S.C. § 2244(b)(4). Because Defendant has

provided no reason to believe that he may, if facts are fully developed, be able to show he is entitled to relief, *Bracy*, 520 U.S. at 909, the Court will adopt Judge Fine's recommendation and deny his motion for discovery and an evidentiary hearing.

**V.    Motion for Release.**

Defendant filed a motion for release pursuant to Federal Rule of Appellate Procedure 9 and 18 U.S.C. § 3143(b)(1).  Judge Fine recommended that the motion be denied because Defendant has shown neither special circumstances warranting release pending habeas resolution nor a high probability of success on the merits of his claims. *See In re Roe*, 257 F.3d 1077, 1080 (9th Cir. 2001).   The Court agrees with this determination, but need not address it in any detail because Defendant does not object.  *See Thomas*, 474 U.S. at 149.

**VI.    Certificate of Appealability.**

Judge Fine recommends that the Court deny a certificate of appealability. Defendant objects, but without explanation.  CV Doc. 49 at 1.  Given the high standard established by § 2244(b), the Court concludes that no reasonable jurist could find that Defendant is entitled to relief on his § 2255 motion.  The Court therefore will accept Judge Fine's recommendation that the certificate of appealability be denied.

**IT IS ORDERED:**

1.      Judge Fine's R&R (CV Doc. 48) is **accepted**.

2.      Defendant's amended § 2255 motion (CV Doc. 21) is **denied.**

3.      Defendant's motion for release pending appeal (CV Doc. 10) is **denied**.

4.      Defendant's motion for discovery and request for evidentiary hearing (CV Doc. 24) is **denied**.

5.      A certificate of appealability is **denied**.

6.      The Clerk is directed to terminate this action.

Dated this 12th day of April, 2021.

_David G. Campbell_

David G. Campbell
Senior United States District Judge